UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                                    PLAINTIFF

v.                                                     CRIMINAL ACTION NO. 3:15CR-99-DJH

CHRISTOPHER MATTINGLY                                                     DEFENDANT

MOTION TO SUPPRESS THE WIRETAP EVIDENCE
AND ALL EVIDENCE DERIVED THEREFROM
*ELECTRONICALLY FILED*

Comes the defendant, Christopher Mattingly, by counsel Brian Butler and Alex Dathorne, and hereby moves this Court to Order the United States to suppress the wiretap evidence and all evidence derived therefrom as said wiretap was not properly authorized and said wiretap was not necessary as it was issued prior to attempting and exhausting normal investigative procedures. In support of the motion, Mr. Mattingly states as follows:

Chris Mattingly was indicted on September 1, 2015 for conspiring to knowingly and intentionally distribute 1000 kilograms or more of marijuana between May 1, 2014 and June 1, 2015. The investigative agency assisting the United States is the Bullitt County Drug Task Force.

**BACKGROUND**

The United States tendered discovery stemming from a Riverside, California state wiretap. According to USA Today Riverside County, California judge assigned to review wiretaps issued "almost five times as many wiretaps as any other judge in the United States" and "three times more taps than all of the federal judges in California combined last year." *Exhibit 1.* USA Today further reported that Riverside County, a Los Angeles suburb, "approved almost one

of every five United States wiretaps last year." *Exhibit 2*. All of the applications for wiretaps associated with this matter were signed by assistant district attorneys in Riverside, California, not by the elected Riverside County District Attorney.

Assistant District Attorney Jeffery Van Wagenen, Jr. applied for a state wiretap connected to four separate telephone numbers on March 11, 2014. *Exhibit 3*. The wiretap application affidavit was submitted under penalty of perjury by Detective Christopher Carnahan of the Riverside Police Department.

The wiretap application included a required section entitled "Necessity and Exhaustion." The 'Necessity and Exhaustion' section uses boilerplate language to outline the goals of the wiretap investigation. *Exhibit 3, pgs 25-26*. Then, the 'Necessity and Exhaustion' section delineates investigative techniques "which have been used or which I have considered using in this investigation." *Exhibit 3, pgs 26-39*.

The 'Necessity and Exhaustion' section concerning 'Interviews' entirely uses boilerplate language. In sum, the section details not one attempt at interviewing anybody. *Exhibit 3, pgs 26-27*. The 'Necessity and Exhaustion' section concerning 'Confidential Informants' also uses only boilerplate language. In sum, the section does not detail a single attempt at trying to recruit an informant. *Exhibit 3, pg 27*. The 'Necessity and Exhaustion' section addressing 'Undercover Officers / Agents' uses only boilerplate language. Again, no attempt is made to introduce an undercover officer or agent. *Exhibit 3, pgs 27-28*. The 'Necessity and Exhaustion' section relating to 'Controlled Purchases' again regurgitates boilerplate language and makes no attempt to conduct a controlled purchase. *Exhibit 3, pgs 28-29*.

The 'Necessity and Exhaustion' section concerning 'Surveillance' delineates five surveillance attempts between November 2013 and March 2014 including two successful

attempts in seizing narcotics on December 12, 2013 and March 3, 2014.  However, the affidavit is silent as to what less intrusive methods were utilized to follow up on these significant drug seizures.  *Exhibit 3, pgs 29-33.*

The 'Necessity and Exhaustion' section relating to 'Search Warrants' once again relies primarily on boilerplate language to attempt to explain why law enforcement did not do anything. *Exhibit 3, pgs 33-35.*  The only specific acts listed were applying for a search warrant on January 22, 2014 concerning a target telephone and applying for search warrants on target telephones on February 25, 2014.  *Exhibit 3, pg 33.*  As is characteristic of this affidavit, the affiant does not indicate what information was gleamed from these search warrants nor if any attempt was made to follow up on the information obtained.  The affiant simply relies upon boilerplate language.

The 'Necessity and Exhaustion' section concerning 'Pen Registers and Telephone Tolls' indicates that they have been used in the investigation.  *Exhibit 3, pg 35.*  However, no specific details have been outlined and the entire section is boilerplate.[1]

The 'Necessity and Exhaustion' section relating to 'Closed Circuit Television Monitoring' uses boilerplate language to once again attempt to explain why law enforcement did not try this investigative technique.  *Exhibit 3, pgs 35-36.*  The 'Necessity and Exhaustion' section concerning 'Trash Searches of Target Locations' uses boilerplate language to further attempt to explain why law enforcement did not try this investigative technique.  *Exhibit 3, pgs 36-39.*  The 'Necessity and Exhaustion' section discussing 'Financial Investigation' also uses boilerplate language to attempt to explain why law enforcement did not do any financial investigation.  *Exhibit 3, pg 28.*  Finally, the 'Necessity and Exhaustion' section discussing the

---

[1] In fact, the section references "use of pagers" which are nearly non-existent and a relic of the past which likely indicates that the boilerplate language has been in use for many years and the affiant did not even bother to read it.

"Grand Jury' again uses standard boilerplate language to attempt to explain why there has not been any attempt at a Grand Jury investigation. *Exhibit 3, pgs 38-39*. Based almost entirely upon boilerplate language, a state court judge in Riverside, California authorized wire intercepts.

On April 8, 2014, Assistant District Attorney Jeffery Van Wagenen, Jr. applied for a spinoff wiretap from the aforementioned wiretap. *Exhibit 4*. This application sought to intercept wire communications from (502) 609-5937. The United States has identified (502) 609-5937 as Chris Mattingly's phone number. The affidavit in support of April 8th application indicates that narcotics related conversations were captured from the March 11th wiretap between the target phone and Chris LNU (last name unknown) at (502) 609-5937. *Exhibit 4, pgs 17-19*.

The wiretap application included a required section entitled "Necessity and Exhaustion." The 'Necessity and Exhaustion' section uses boilerplate language to outline the goals of the wiretap investigation. *Exhibit 4, pgs 26-27*. In fact, the goals of the wiretap investigation verbiage is **identical** to the verbiage used in the goals of the wiretap investigation affidavit from the March 11, 2014 application. *See Exhibit 3, pgs 25-26 and Exhibit 4, pgs 26-27*.

The 'Necessity and Exhaustion' section concerning 'Interviews' entirely uses boilerplate language. This section does not detail one attempt at interviewing anybody. *Exhibit 4, pg 27*. Again, the boilerplate language attempting to justify not attempting to do any interviews is **identical** to the language in the March 11, 2014 application. *See Exhibit 3, pgs 26-27 and Exhibit 4, pg 27*.

The 'Necessity and Exhaustion' section concerning 'Confidential Informants' also uses only boilerplate language. Again, the section does not detail a single attempt at trying to recruit an informant. *Exhibit 4, pgs 27-28*. Once again, the boilerplate language attempting to justify not attempting to recruit any informants is **identical** to the language in the March 11, 2014

application.  *See Exhibit 3, pg 27 and Exhibit 4, pgs 27-28.*

The 'Necessity and Exhaustion' section addressing 'Undercover Officers / Agents' uses only boilerplate language.  Again, no attempt is made to introduce an undercover officer or agent. *Exhibit 4, pgs 28-29.*  The boilerplate language attempting to justify not attempting to use undercover officers /agents is **identical** to the language in the March 11, 2014 application.  *See Exhibit 3, pgs 27-28 and Exhibit 4, pgs 28-29.*

The 'Necessity and Exhaustion' section relating to 'Controlled Purchases' again regurgitates boilerplate language and makes no attempt to conduct a controlled purchase.  *Exhibit 4, pg 29.*  Again, the boilerplate language attempting to justify not attempting any controlled purchases is **identical** to the language in the March 11, 2014 application.  *See Exhibit 3, pgs 28-29 and Exhibit 4, pg 29.*

The 'Necessity and Exhaustion' section concerning 'Surveillance' delineates the same five surveillance attempts between November 2013 and March 2014 including two successful attempts in seizing narcotics on December 12, 2013 and March 3, 2014.  *See Exhibit 3, pgs 29-31 and Exhibit 4, pgs 29-31.*  During the time between applications, the affidavit documents **only two** additional surveillance attempts which both occurred in California, not Kentucky.  Once again, the affidavit is utterly silent as to what less intrusive methods than a wiretap were utilized to follow up on the few documented surveillance attempts.  *Exhibit 4, pgs 29-33.*  Once again, the exact same boilerplate language is utilized to attempt to justify not doing more surveillance before requesting another wiretap.  *Exhibit 3, pgs 31-33 and Exhibit 4, pgs 31-33.*

The 'Necessity and Exhaustion' section relating to 'Search Warrants' once again relies primarily on boilerplate language to attempt to explain why law enforcement did very little.  *Exhibit 3, pgs 33-35.*  Once again, the boilerplate language in the March 11, 2014 application is

the same language used in the April 8, 2014 application. *Exhibit 3, pgs 33-35 and Exhibit pgs 34-35*. The April 11th application documents four additional search warrants concerning "target telephones". *Exhibit 4, pg 34*. Once again, the affiant does not indicate what information was gleamed from these search warrants nor if any attempt was made to follow up on the information obtained. Once again, no search warrants were sought for any physical locations. The affiant simply relies upon boilerplate language.

The 'Necessity and Exhaustion' section concerning 'Pen Registers and Telephone Tolls' indicates that they have been used in the investigation. *Exhibit 4, pgs 35-36*. However, no specific details have been outlined and the entire section is the exact same boilerplate use in the March 11th application.[2] *Exhibit 3, pg 35 and Exhibit 4, pgs 35-36*.

The 'Necessity and Exhaustion' section relating to 'Closed Circuit Television Monitoring' uses the same boilerplate language as utilized in the March 11th application but further states they have used "this type of monitoring for Rey LNU." *Exhibit 4, pg 36*. The affidavit is silent regarding what attempts they have made to follow up on any information they may have gathered from watching Rey LNU. The affidavit is silent as to any attempt to use this type of investigative tool to investigate Chris Mattingly.

The 'Necessity and Exhaustion' section concerning 'Trash Searches of Target Locations' uses the exact same boilerplate language to further attempt to explain why law enforcement did not try this investigative technique. *Exhibit 3, pgs 36-39 and Exhibit 4, pgs 37-39*. The 'Necessity and Exhaustion' section discussing 'Financial Investigation' also uses boilerplate language. *Exhibit 4, pgs 38-39*. The affidavit indicates that they learned some bank account

---

[2] Again, the section references "use of pagers" which are nearly non-existent and a relic of the past which likely indicates that the boilerplate language has been in use for many years and the affiant did not even bother to read it.

information relating to Rey LNU but is silent as to any follow up information derived from the prior interception. The affidavit is silent as to any attempt to locate or obtain financial information about Chris Mattingly. Finally, the 'Necessity and Exhaustion' section discussing the "Grand Jury' again uses standard boilerplate language to attempt to explain why there has not been any attempt to use the Grand Jury as a less intrusive investigative technique. *Exhibit 4, pg 39.* Once again, the boilerplate language attempting to explain why nothing was done is **identical** to the verbiage used in the prior application. *Exhibit 3, pgs 38-39 and Exhibit 4, pg 39.* Again, however, a state court judge rubber stamped a wiretap application from Assistant District Attorney Jeffery Van Wagenen, Jr. based almost entirely upon boilerplate language.

On October 27, 2014, Assistant District Attorney Creg Datig applied for a spinoff wiretap from the aforementioned wiretap based upon information procured from the previous wiretaps. *Exhibit 5.* On February 19, 2015, Assistant District Attorney John Aki applied for yet another spinoff wiretap again based upon information procured from the previous wiretaps. *Exhibit 6.*

The United States supplied an affidavit, with attachments, from Deputy District Attorney Deena Bennett. *Exhibit 7.* In her affidavit, Ms. Bennett acknowledges that "wiretap paperwork, all wiretap affidavits and applications were submitted directly to the Assistant District Attorney" during District Attorney Paul Zellerbach's tenure. *Exhibit 7, pg. 4, paragraph 16.* Mr. Zellerbach was the District Attorney at the time of original application on March 11, 2014 and the spin-off applications on April 8, 2014 and October 27, 2014.[3] Ms. Bennett further states, "Mr. Zellerbach did not keep records or a calendar that consistently, regularly, or accurately, reflected his day-to-day business." *Exhibit 7, pg. 4, paragraph 17.*

---

[3] Mr. Zellerbach lost his reelection bid to Michael Hestrin and was subsequently prosecuted and convicted for vandalizing Mr. Hestrin's election signs. *Exhibit 7.*

According to USA Today, Mr. Zellerbach acknowledged in two interviews ... that he could not recall having reviewed or personally authorized any of the county's wiretap applications and said he was unaware of the details of the requests.  *Exhibit 2*.  Mr. Zellerbach was quoted as saying, "I didn't have time to review all of those, No way."  *Exhibit 2*.  Mike Ramos, District Attorney of San Bernardino, California, stated that he warned Mr. Zellerbach about the implications of not personally signing the wiretaps and Mr. Zellerbach said it would be impossible for him to sign them all.  *Exhibit 2*.

## ARGUMENT

**A.     The wiretaps in question were not properly authorized.**

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 prescribes the procedure for securing judicial authority to intercept wire communications and who has the statutory authority to request said authorization.  18 United States Code (U.S.C.) § 2516 (2) states:

> The principal prosecuting attorney of any State, or the principal prosecuting attorney of any political subdivision thereof, if such attorney is authorized by a statute of that State to make application to a State court judge of competent jurisdiction for an order authorizing or approving the interception of wire, oral, or electronic communications, may apply to such judge for, and such judge may grant in conformity with section 2518 of this chapter and with the applicable State statute an order authorizing, or approving the interception of wire, oral or electronic communications having responsibility for the investigation of the offense as to which the application is made ...

Wire interceptions are extremely intrusive and violate the subject's privacy rights.  Because of the significant privacy intrusion, Congress narrowly confined who may apply for a wiretap.  Congress wanted the application process "limited to those responsive to the political process."  *United States v. Giordano*, 416 U.S. 505, 520 (1974).  For example, even a Presidentially

appointed United States Attorney does not have the authority to apply for a wiretap. On the state level, only the "principal prosecuting attorney of any State" (i.e. the State Attorney General) or the "principal prosecuting attorney of a political subdivision" (i.e. the elected District Attorney) may apply for a wiretap. 18 United States Code (U.S.C.) § 2516 (2) is quite clear on its face that an assistant district attorney in Riverside County, California does not have the authority to apply for a wiretap.

In *Giordano*, the United States Attorney General's Executive Assistant authorized submission of the wiretap application. 416 U.S. at 512. The United States Supreme Court noted that pursuant to the plain language of 18 U.S.C. § 2516 (1) only the "Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an application for intercept authority." 416 U.S. at 513. The Supreme Court further stated, "The mature judgment of a particular, responsible Department of Justice official is interposed as a **critical** precondition to any judicial order." {emphasis added} *Giordano*, 416 U.S. at 516. The United States Supreme Court further noted that the authority to apply for wiretaps is limited to "those responsive to the political process." *Giordano*, 416 U.S. at 520. The United States Supreme Court specifically held that the Executive Assistant to the United States Attorney General did not have the authority to apply for a wiretap. *Id.* The remedy for ignoring the statutory requirements is suppression. *Giordano*, 416 U.S. at 528.

In the matter before the Court, the district attorney did not apply for any of the wiretaps in question. All of the applicable wiretaps were authorized by an assistant district attorney. Assistant district attorneys do not have the statutory authority in California to apply for a wiretap except under very limited circumstances.

California Penal Code § 629.50 states that "a district attorney, or the person designated to

act as district attorney in the district attorney's absence," may apply to the court "for an order authorizing the interception of a wire or electronic communication." In *United States v. Perez-Valencia*, the Ninth Circuit addressed the application of California Penal Code § 629.50 to a motion to suppress a wiretap based upon an assistant district attorney, not the district attorney, applying for the wiretap. 727 F.3d 852 (9th Cir. 2013) and 744 F.3d 600 (9th Cir. 2014).

In *Perez-Valencia*, an assistant district attorney applied for the challenged wiretap. The assistant district attorney was 'designated' pursuant to California Penal Code § 629.50 to apply for the wiretap in the district attorney's absence. 727 F.3d at 853-854. The district attorney was out of the office attending to an ill family member who had undergone surgery for a serious health issue. *Id.* The defendant moved to suppress the wiretap on the basis of said wiretap not having been signed by the district attorney. The Ninth Circuit held that an assistant district attorney can apply for a wiretap pursuant to California Penal Code § 629.50 if, and only if, the designated assistant district attorney is "acting in the district attorney's absence not just as an assistant district attorney designated with the limited authority to apply for a wiretap order, but as an assistant district attorney duly designated to act for **all** purposes as the district attorney of the political subdivision in question." *Perez-Valenzia*, 727 F.3d at 855.[4] The Ninth Circuit returned the case to the trial court for a factual inquiry.

The case went back to the trial court for a fact finding hearing and was subsequently appealed again to the Ninth Circuit. *United States v. Perez-Valencia*, 744 F.3d 600 (9Th Cir.

---

[4] *See also State v. Daniels*, 389 So.2d 631 (Fla.SCt. 1980) (interpreting 18 U.S.C. § 2516 and *United States v. Giordano*, 416 U.S. 505 (1974), the Florida Supreme Court held that an assistant district attorney may only apply for a wiretap when the district attorney delegates his authority "to allow for the continuity of administration when the state attorney is absent for an extended period of time" but concluding that Florida law did not permit any delegation of authority to an assistant district attorney.

2014). The Ninth Circuit found that the wiretap was properly applied for by an assistant district attorney based upon California Penal Code § 629.50. The Ninth Circuit upheld the wiretap because the Court made two critical and necessary findings. First, the assistant district attorney's authority to act in the district attorney's absence was not limited to only applying for wiretap orders. The designated assistant attorney assumed all the powers, duties and responsibilities of the district attorney. *Perez-Valencia*, 744 F.3d at 602. Second, the Ninth Circuit found the district attorney was truly absent and unavailable. The district attorney's wife underwent surgery during the time of the wiretap application. The district attorney was completely devoted to caring for his wife in the hospital and moving her back home when she was discharged. The district attorney was not in communication with anyone from the office during work hours. Based upon these extreme circumstances, the Court found the district attorney "absent from and unavailable to" the district attorney's office. *Perez-Valencia*, 744 F.3d at 603.

Applying the aforementioned authority to the facts concerning the alleged delegation of authority by Paul Zellerbach and, subsequently, Michael Hestrin, the Court should suppress the wiretaps and all evidence derived therefrom. Mr. Zellerbach acknowledged in two interviews ... that he could not recall having reviewed or personally authorized any of the county's wiretap applications and said he was unaware of the details of the requests. *Exhibit 2*. Mr. Zellerbach is quoted as saying, "I didn't have time to review all of those, No way." *Exhibit 2*. Mr. Zellerbach's comments acknowledge what is apparent when you look at the evidence; Mr. Zellerbach abdicated his legal responsibility to oversee the applications for wiretaps in Riverside, California.

Mr. Zellerbach was district attorney when three of four wiretaps associated with this case

were applied for. On none of the occasions[5], did Mr. Zellerbach personally apply for the wiretap. The United States's supplied Deena Bennett's affidavit in an attempt to justify Mr. Zellerbach's abdication of his statutory responsibilities. *Exhibit 7*. Ms. Bennett certifies that "Mr. Zellerbach did not keep records or a calendar that consistently, regularly, or accurately, reflected his day-to-day business." *Exhibit 7*. It defies common sense to assume that it is merely coincidence that Mr. Zellerbach just so happened to be absent and unavailable on the dates these wiretaps were authorized. What happened is what Mr. Zellerbach told USA Today; he did not review any wiretaps and he delegated his legal responsibility to an assistant in violation of federal law and California law.

The United States Supreme Court made it crystal clear in *Giordano* that authorizing a wiretap is limited to those that are responsive to the political process. *Giordano*, 416 U.S. at 520. The Ninth Circuit concluded that a district attorney can designate an assistant district attorney to act if they are absent and unavailable such as when the district attorney is attending to his wife during and immediately after surgery. *Perez-Valencia*, 744 F.3d at 603. What cannot happen is what happened here; in this case District Attorney Zellerbach was so neglectful of his statutory duties that he pawned off his responsibility to an assistant in perpetuity.

Title III of the Omnibus Crime Control and Safe Streets Act of 1968 strictly limited who can apply for a wiretap because Congress was rightfully concerned with insuring that individual privacy was protected and that wiretaps would be used judiciously and only when necessary. What they feared is what Paul Zellerbach created by his dereliction of duty; a rogue district attorney's office that applied for 20% of the wiretaps in the United States with no oversight by an

---

[5] March 11, 2014
April 8, 2014
October 27, 2014

elected official and no concern for privacy rights.  *Exhibit 2.*  Paul Zellerbach did not want to trouble himself with the statutory duties associated with the office he chose to run for and the people of Riverside, California elected him to do.  Paul Zellerbach was not absent and unavailable pursuant to California law.  As such, all of the wiretaps associated with this case and the evidence derived therefrom should be suppressed.

> **B.** **The wiretaps were premature and not necessary.**

The use of a wiretap should be the last step in an investigation.  18 U.S.C. § 2518(3)(c).  18 U.S.C. § 2518(3)(c) states in relevant part:

> Upon such application the judge may enter an ex parte
> order ... authorizing the interception of wire, oral,
> or electronic communication ... if the judge determines
> on the basis of facts submitted by the applicant that -
> \*\*\*
>
> (c) normal investigative procedures have been tried and
> have failed or reasonably appear unlikely to succeed
> if tried or to be too dangerous.

Title III requires that an application for a wiretap contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *United States v. Stewart*, 306 F.3d 295, 304 (6th Cir. 2002).  The purpose of this 'necessity' requirement is "to ensure that a wiretap is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 (1974).  The necessity component prohibits the impermissible use of a wiretap as the "initial step in a criminal investigation." *Giordano*, 416 U.S. at 515.

The government must overcome the statutory presumption against an intrusive wiretap by proving necessity.  *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2000).  The United

States is not required to prove that every conceivable method of investigation has been tried and failed before seeking a wiretap. *United States v. Alfano*, 838 F.2d 158, 163 (6th Cir. 1988). But, other reasonable investigative means must not be viable alternatives. *United States v. London*, 66 F.3d 1227, 1237 (1st Cir. 1995). A purely conclusory affidavit unrelated to the instant case and not showing any factual relations to the circumstances at hand does not satisfy the necessity component of the statute. *United States v. Rice*, 478 F.3d 704, 710 (6th Cir. 2007) *citing* United States v. Landmesser, 553 F.2d 17, 20 (6th Cir. 1977).

In *Rice*, the Sixth Circuit in upholding the suppression of the wiretap held that specific information that the cooperating source was not able to make contact with Rice, and therefore, would not be of use and that the pen registers and telephone tolls revealed possible connections to other people with histories of drug-related arrests was not sufficient to establish necessity. 478 F.3d at 711. "Generalized and uncorroborated information about why grand jury subpoenas, witness interviewing and search warrants, and trash pulls would not be useful" was not sufficient to establish necessity. *Id.*

In *United States v. Gonzalez*, 412 F.3d 1102 (9th Cir. 2005), the Ninth Circuit upheld the suppression of a wiretap. The Court concluded that sufficient normal investigative techniques had not been utilized. *Gonzalez*, 412 F.3d 1112-1113. The Court stated that use of pen registers alone is insufficient to establish necessity for a wiretap. *Id. citing United States v. Carneiro*, 861 F.2d 771 (9th Cir. 1988). The Court also noted that very limited physical surveillance is not sufficient. *Gonzalez*, 412 F.3d 1113. The Court further noted that one attempt to infiltrate the organization was insufficient. *Gonzalez*, 412 F.3d 1113.

The Ninth Circuit, as the Sixth Circuit did in *Rice,* held that the wiretap application could not be saved by boilerplate language about why law enforcement had not done anything such as

the affidavit's terse rejection of the possible productive use of grand jury subpoenas or search warrants. *Gonzalez*, 412 F.3d 1114. The Court stated that the affidavit's rejection of tools such as grand jury subpoenas and search warrants by claiming they would likely reveal the investigation to its targets does not reasonably explain why traditional investigative tools are unlikely to succeed in a particular investigation. *Id.* Rather, they are "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures," which the Court found insufficient to establish necessity. *Id.*

In *Blackmon*, the Ninth Circuit addressed a spin-off wiretap where the government did not conduct any investigation specifically targeted at Blackmon. 273 F.3d at 1208. The necessity sections of the prior wiretap and the spin-off were nearly identical with the exception of trap and trace devices and pen registers. *Id.* The Court suppressed the wiretap finding that material omissions and misstatements were made as it relates to Blackmon because nothing had been done to investigate Blackmon and generalized statements that would be true of any narcotics investigation fail to contain sufficiently specific facts to satisfy the requirements of 18 U.S.C. § 2518. *Blackmon*, 273 F.3d at 1211.

Applying the aforementioned authority to this matter, the Court should find that the necessity component was not satisfied and suppress the wiretaps. The initial March 11, 2014 was issued almost entirely based upon boilerplate language. The affidavit indicates that they made only five surveillance attempts and two were successful in seizing drugs. The affidavit is silent, other than boilerplate language, as to what follow up investigation, if any, was conducted based upon the seizure of drugs. The affidavit indicates that two search warrants were sought concerning target telephones but no information, other than boilerplate language, is provided concerning what information, if any, resulted and what follow up, if any, was conducted. No

interviews were attempted.  No attempts were made to recruit a confidential source.  No attempts were made to introduce an undercover officer or agent.  No attempts were made to do a controlled purchase.  No closed circuit television monitoring was attempted.  No trash pulls or trash searches were conducted.   No financial investigation was attempted.  The Grand Jury was not utilized.  Despite the investigation having success with two drug seizures, the Riverside County District Attorney's Office sought a wiretap without doing any further investigation and without even trying most forms of less intrusive investigation.  The wiretap was used as an initial step in the investigation not as a last option as mandated by *Giordano.*   416 U.S. at 515.

      The April 8, 2014 spinoff wiretap sought to intercept Chris Mattingly's phone number.  The wiretap application is nearly identical to the March 11th application.  The application is almost entirely boilerplate language attempting to justify extremely limited investigation before seeking a wiretap.  Critically, the government did not try **any** less intrusive investigation techniques in their investigation of Chris Mattingly.  Their initial and only step in the investigation of Chris Mattingly was to seek a wiretap.  This is not permissible.  *Giordano,* 416 U.S. at 515 and *Blackmon*, 273 F.3d 1204 (9th Cir. 2000).

      The wiretaps in question are representative of a systematic problem in Riverside County.  As previously stated, they issued 20% of the wiretaps in the United States. *Exhibit 2.*  They could not have possibly investigated their cases thoroughly prior to seeking a wiretap as a last resort.  In fact, Mr. Zellerbach was quoted as saying, "I didn't have time to review all of those, No way." *Exhibit 2.*  There were so many wiretaps being issued the District Attorney, the statutory obligation to review them, acknowledged there were so many he could not have possibly even read them all.  His statement speaks volumes as to how little investigation was being done before seeking approval for a wiretap.  While the undersigned is only concerned with

the wiretaps before the Court, it is very likely that most, if not all, of the wiretaps approved during Mr. Zellerbach's tenure were sought as an initial step in the investigation based upon cut and paste affidavits with boilerplate language utilized in all narcotics investigations. In sum, Riverside County made a mockery of individual privacy rights, ignored federal requirements limiting the use of wiretaps and permitted law enforcement to intercept telephone calls at their whim and caprice.

      C.      **Suppression is the appropriate remedy**

18 U.S.C. § 2518 (10) provides,

> Any aggrieved person in any trial, hearing, or proceeding in or before any court, ... of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any wire or oral communication intercepted pursuant to this chapter, or evidence derived therefrom, on the grounds that-
>
> > (i) the communication was unlawfully intercepted;
> > (ii) the order of authorization or approval under which it was intercepted is insufficient on its face; or
> > (iii) the interception was not made in conformity with the order of authorization or approval.
>
> ... If the motion is granted, the contents of the intercepted wire or oral communication, or evidence derived therefrom, shall be treated as having been obtained in violation of this chapter. ..."

In *Giordano*, the United States Supreme Court held that "suppression must follow" when it is shown that the wiretap application was improperly authorized. 416 U.S. at 528. In *Rice*, the Sixth Circuit stated, "Because the necessity requirement is a component of Title III, and because suppression is the appropriate remedy for a violation under Title III, where a warrant application does not meet the necessity requirement, the fruits of any evidence obtained through that warrant must be suppressed." 478 F.3d at 710 *citing Giordano*, 416 U.S. at 524-525.

The Sixth Circuit in *Rice* also held that the good-exception to the usual rule that courts should exclude evidence obtained in violation of the Fourth Amendment is inapplicable to improperly issued wiretaps. 478 F.3d at 712. Given the reckless pervasiveness of wire interceptions stemming from the Riverside County District Attorney's Office, it is difficult to imagine a credible argument that law enforcement relied upon their wiretap applications in good-faith. In fact, it is much more probable that law enforcement sought to use Riverside County to obtain wiretaps because they knew their applications would never survive federal scrutiny. Nonetheless, Sixth Circuit precedent does not recognize a good-faith exception in the context of wiretap interceptions. *Id.*

### D. Conclusion

"Congress legislated in considerable detail in providing for applications and orders authorizing wiretapping and evinced the clear intent to make doubly sure that the statutory authority be used with restraint and only where the circumstances warrant the surreptitious interception of wire and oral communications." *Giordano*, 416 U.S. at 515. The Riverside County District Attorney's Office made a mockery of Congressional intent and issued illegal wiretaps with astounding frequency including the wiretaps in question in this case. The wiretap evidence obtained against Chris Mattingly and all evidence derived from it was illegally obtained and, therefore, is inadmissible.

WHEREFORE, the undersigned requests that the Court enter the attached Order suppressing the wiretaps and any and all evidence derived therefrom or, in the alternative, to schedule this matter for a *Franks* hearing in order for the Court to be more fully advised.

Respectfully submitted,

/S/ Brian Butler

_____
BRIAN BUTLER
Dathorne & Butler, LLC
600 West Main Street, Suite 500
Louisville, Kentucky 40202
(502) 594-1802

CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2016, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the Hon. Larry Fentress.

Respectfully submitted,

/S/Brian Butler

_____
BRIAN BUTLER